Joseph S. STREET, Appellant,

v.

Leslie HEDGEPATH, M.D., Appellee.

Joseph S. STREET, Appellant,

v.

GEORGETOWN UNIVERSITY,
et al., Appellees.

Nos. 89–CV–181, 89–CV–1331.

District of Columbia Court of Appeals.

Argued March 21, 1991.
Decided May 1, 1992.
As Amended June 23, 1992.

Philip Clarke Baten, Washington, D.C., for appellant.

William F. Causey, Washington, D.C., for appellee in No. 89–CV–181. Steven A. Hamilton and Scott D. Austin, Washington, D.C., were on the brief for appellee in No. 89–CV–181.

John J. Buckley, Jr., with whom Eva M. Petko, Peter W. Chatfield, and Sheila Zimmet, Washington, D.C., were on the brief, for appellees Georgetown University, Jerry Earll, M.D., John Dillon, M.D., and Peter Kenmore, M.D., in No. 89–CV–1331.

Harold A. Sakayan, with whom Gerald I. Holtz, Washington, D.C., was on the brief, for appellees Steven A. Hamilton and Donahue, Ehrmantraut & Montedonico, Chartered, in No. 89–CV–1331.

Before TERRY, SCHWELB and FARRELL, Associate Judges.

TERRY, Associate Judge:

These are consolidated appeals in two separate but related cases. In *Street v. Hedgepath* ("the *Hedgepath* case"), appellant Joseph Street sued Dr. Leslie Hedgepath, his late wife's physician, for medical malpractice allegedly resulting in Mrs. Street's death from cancer.[1] The case proceeded on the theory that Dr. Hedgepath breached the applicable standard of care by failing to diagnose Mrs. Street's thyroid cancer in time to prevent its fatal spread to other parts of her body. After a trial before Judge Hamilton, the jury was un-

---

1. The complaint also named Washington Hospital Center as a defendant. The trial court granted summary judgment for the hospital, and this court affirmed that judgment. *Street v. Washington Hospital Center,* 558 A.2d 690 (D.C.App. 1989).

able to agree on a verdict, and the judge declared a mistrial. Hedgepath then filed a motion for directed verdict. From the order granting that motion, Street noted the first appeal (No. 89–CV–181).[2]

Mr. Street then filed a civil action, *Street v. Georgetown University, et al.* ("the *Georgetown* case"), against Dr. Hedgepath's attorney, Steven A. Hamilton, Mr. Hamilton's law firm, three physicians who had treated Mrs. Street after her cancer had been diagnosed, and Georgetown University Hospital. This was not a medical malpractice action. The basis of Street's complaint was his allegation that the treating physicians, in the course of *ex parte* communications with Mr. Hamilton, had improperly disclosed information they had learned while treating Mrs. Street. The complaint alleged that some of the treating physicians had testified at trial that any negligence on the part of Dr. Hedgepath could not have proximately caused Mrs. Street's injuries. Mr. Street sought damages for this supposed breach of the confidential physician-patient relationship, asserting that the breach had "resulted in a hung jury" in the *Hedgepath* case. Appellees filed an answer and then moved to dismiss the complaint under Super.Ct.Civ.R. 12(b)(6) for failure to state a claim upon which relief could be granted. Judge Shuker granted the motion, and Mr. Street noted the second appeal (No. 89–CV–1331).[3]

In the *Hedgepath* case we hold that the trial court did not err in striking the testimony of Mr. Street's expert witness. Because that was the only testimony offered by Mr. Street to establish the relevant standard of care, we further hold that the evidence properly before the jury was insufficient to prove his malpractice claim. In the *Georgetown* case we hold that by filing the malpractice complaint in the *Hedgepath* case, Mr. Street waived, as a matter of law, the physician-patient privilege on which his tort claim in the *Georgetown* case was based. Accordingly, we affirm the dismissal of the latter claim.

I

A. The *Hedgepath* case

Victoria Street first saw Dr. Hedgepath for treatment of her diabetes in 1982. Over the next three years Mrs. Street saw Dr. Hedgepath approximately every four to six weeks. On each of these occasions, Dr. Hedgepath examined Mrs. Street and made notes of his examinations. When Mrs. Street visited Dr. Hedgepath on September 6, 1985, her thyroid appeared normal, with no swelling.

On October 19, 1985, Mrs. Street had her portrait taken at a social gathering. This photograph, which was introduced into evidence at trial, purports to show a swelling in Mrs. Street's neck, in the general area of the thyroid gland. Mrs. Street saw Dr. Hedgepath a few days later, on October 24, and again Dr. Hedgepath did not notice any swelling in her thyroid. When she saw him again on December 13, however, Dr. Hedgepath observed that the right lobe of her thyroid was enlarged. He referred her to the Washington Hospital Center for some thyroid tests.

On January 2, 1986, Mrs. Street called Dr. Hedgepath to complain about a pain in her right shoulder which she had first noticed on Christmas Day. Dr. Hedgepath prescribed a pain killer, and on January 10, when he next saw her, he continued her on the prescription. A few days later, on January 15, Mrs. Street saw Dr. Herbert Baraf, a rheumatologist, for treatment of the pain in her shoulder. Dr. Baraf soon discovered that Mrs. Street had cancer of the thyroid, which had metastasized to the bones in her shoulder. Mrs. Street was admitted to Georgetown University Hospital, where Dr. John Dillon removed her thyroid on January 28. She was then re-

**2.** The trial court also denied Street's alternative motion for a new trial. Street challenges that ruling as well.

**3.** Shortly after the second appeal was filed, the appellees filed a motion for summary affirm-

ance, which this court initially granted. After appellant filed a petition for rehearing, however, we vacated the summary affirmance order and consolidated the two appeals.

ferred to Dr. Jerry Earll, Chief of the Division of Medicine at Georgetown University Hospital, for treatment of her cancer. Unfortunately, Mrs. Street's cancer progressed, and she died on November 24, 1986.

Mr. Street then sued Dr. Hedgepath for medical malpractice. He proceeded on the theory that Dr. Hedgepath had a duty to diagnose Mrs. Street's illness correctly, and that he had breached that duty by failing to notice her enlarged thyroid during the office visit on October 24, 1985.

At trial, after an extensive *voir dire*, the court accepted Dr. Christopher Asplin as an expert in the field of endocrinology. Mr. Street presented Dr. Asplin's testimony to establish the applicable standard of care and to prove that Dr. Hedgepath had breached that standard. Street also relied on Dr. Asplin's testimony to prove that the failure to diagnose Mrs. Street's thyroid cancer in a timely manner proximately caused her injuries and untimely death.

Dr. Asplin testified that he had reviewed the pertinent medical records in the case as well as the photograph of Mrs. Street which we have already mentioned. Dr. Asplin looked at the photograph and testified that he could see a swelling in her neck. He said that if the photograph was taken on October 19, 1985, then the swelling evident in the photograph should have been detected by Dr. Hedgepath when he saw Mrs. Street in his office on October 24. Asplin further testified that Dr. Hedgepath had breached the applicable standard of care by failing to notice the swelling during that office visit and then failing to take steps to diagnose and treat the swelling as thyroid cancer. He stated that, in his medical opinion, Dr. Hedgepath's failure to diagnose Mrs. Street's thyroid cancer on October 24 was "a substantial contribution to the poor outcome in this case," and that Dr. Hedgepath's alleged negligence was the proximate cause of Mrs. Street's death.

Dr. Asplin admitted on cross-examination that he was not an expert in photography. He also admitted that he could not tell from the photograph whether the swelling he saw there was a hard or soft spot, whether it was tender or not, or whether the skin was attached to it. He further conceded that he would have to speculate in order to say that the swelling he saw in the photograph was the enlarged thyroid that was ultimately removed. Finally, he acknowledged that all of his opinions in this case were based on his evaluation of the photograph. If that evaluation was wrong, he said, all of the opinions he had rendered in the case would have to be "withdrawn."

Dr. Earll, Mrs. Street's treating physician, testified for the defense. He gave his opinion that even if the cancer had been detected during the October 24 office visit, by that point the cancer had spread throughout Mrs. Street's body to such an extent that she could not have been effectively treated. He concluded that diagnosing the tumor on October 24 would not have saved Mrs. Street's life because she had "a very bad tumor" of a type that is often fatal "even when it is very, very small." The size of the tumor when it was first discovered in January showed that it had metastasized "long, long before [October]." When asked about his treatment of Mrs. Street once her cancer was diagnosed, Dr. Earll said that he used the standard treatment, radioactive iodine, but that it was ineffective in her case, as it sometimes is. Because the cancer did not respond to treatment, he testified, an earlier diagnosis and treatment would not have led to a different result.

Looking at the photograph, Dr. Earll testified that all he could see in it was a shadow, and that he could not tell from an examination of the photograph whether Mrs. Street's thyroid was enlarged. He later said that, even if the photograph depicted a swollen neck, there were other possible explanations for such swelling, not the least of which was the fact that Mrs. Street was overweight.

Counsel for Dr. Hedgepath moved for a directed verdict at the close of the plaintiff's case and again at the close of all the evidence. The court denied both motions, and the case went to the jury. When the jury reported that it was deadlocked, the court declared a mistrial and then enter-

tained both parties' renewed motions for a directed verdict. Dr. Hedgepath sought a directed verdict on two grounds: first, that Mr. Street had never established that using color photographs to diagnose was generally accepted in the field of medicine, and second, that Mr. Street had failed to prove proximate cause.

In a written order, the court granted the motion for a directed verdict, ruling that expert testimony was necessary to establish both that Dr. Hedgepath had breached the applicable standard of care and that the breach had proximately caused Mrs. Street's death. The court held:

> It was not established that it was part of Dr. Asplin's expertise to diagnose and determine the presence or absence of tissue mass in the area of the thyroid gland through the use of photographs or positive color prints. It was not established that any such procedure was accepted or used in the medical community, and the reliability of such a procedure has never been determined or tested so far as the evidence is concerned.... Indeed, there was no explanation of the scientific or other basis on which a photograph is used to determine the presence or absence of tissue mass.

The court concluded that it should not have allowed Dr. Asplin to testify that Mrs. Street had a tumor on her thyroid when she was examined by Dr. Hedgepath on October 24, 1985. Without this testimony, the court said, Mr. Street failed to present any evidence that Dr. Hedgepath had breached any standard of care. The court then granted the motion without ruling on Dr. Hedgepath's alternate contention that Mr. Street had failed to prove proximate cause.

The trial court also denied Mr. Street's renewed motion for a new trial, based on other allegedly erroneous evidentiary rulings at trial. The court noted that the issue was essentially moot, because even if it had ruled differently on those matters at trial, it "would still direct a verdict in favor of the defendant, and if the jury had returned a verdict in favor of the plaintiff, the Court would enter judgment for the defendant notwithstanding the verdict." On this appeal Mr. Street contests these rulings, as well as the trial court's denial of his motion *in limine* to exclude the opinion testimony of the defense expert witnesses.

### B. The *Georgetown* case

After the trial court declared a mistrial in the *Hedgepath* case, Mr. Street sued Drs. Earll, Dillon, and Kenmore, Mrs. Street's treating physicians at Georgetown University Hospital, as well as the hospital itself, Dr. Hedgepath's attorney, Steven Hamilton, and Mr. Hamilton's law firm. The complaint alleged that the doctors and the hospital had breached the confidentiality of the physician-patient relationship by engaging in *ex parte* communications with the defense attorneys in the *Hedgepath* case. The complaint further alleged that some of the treating physicians had testified adversely to appellant at the trial in *Hedgepath*. As a result of these acts, the complaint asserted, Mr. Street had suffered a hung jury in the *Hedgepath* case. The defendants moved to dismiss or, alternatively, for summary judgment. The trial court granted the defendants' motion to dismiss for failure to state a claim, and Mr. Street noted this appeal.

### II

██ Appellant contends that the trial court lacked jurisdiction to entertain and then decide a motion for directed verdict after it had declared a mistrial in the *Hedgepath* case. He argues that once the court had declared a mistrial, its jurisdiction was limited to setting a new trial date and nothing more. This argument lacks support in either law or logic.

As appellant recognizes, Super.Ct.Civ.R. 50 governs motions for directed verdict and judgments notwithstanding the verdict. Rule 50(b) provides that a party may, within ten days after entry of judgment, move for judgment notwithstanding the verdict. The rule further provides that "if a verdict was not returned, such party, within ten days after the jury has been discharged, may move for judgment in accordance with the party's motion for a directed verdict."

It is thus clear from the very language of Rule 50 that the trial court has jurisdiction to direct a verdict after a mistrial.

■ This precise issue arose in *Embry v. Sears, Roebuck & Co.*, 144 A.2d 891 (D.C.App.1958). In *Embry*, after the jury deadlocked, the defendant renewed its motion for a directed verdict. The trial court granted the motion, and the plaintiff appealed. This court held:

> Appellant questions the propriety of directing a verdict after submission of the case to the jury. Such procedure was neither irregular nor erroneous. However, the failure of the jury to agree is entitled to no consideration in reviewing the grant of the directed verdict. The direction of a verdict was a legal ruling that the evidence viewed most favorably to appellant would not furnish support for a finding by the jury that appellant's injury was caused by the appellee's negligence.

*Id.* at 892 (footnote omitted).[4] Federal precedent is to the same effect.[5] In a case in which the trial court directed a verdict after the jury had deadlocked, the Second Circuit held:

> That the case was originally sent to the jury which twice reported itself deadlocked, after considerable deliberation, does not mean that the actual disagreement was fair and reasonable. If the position of some jurors favoring plaintiff is enough, there could never be a judgment for insufficiency of the evidence notwithstanding a verdict, *nor the direction of judgment on that ground after a mistrial. Both are commonplace and envisaged by Rule 50(b)....*

*Noonan v. Midland Capital Corp.*, 453 F.2d 459, 463 (2d Cir.) (emphasis added), *cert. denied*, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972).

Appellant relies on three cases to support his contention that the trial court lacked jurisdiction to do anything other than set a new trial date. His reliance on these cases is misplaced. In *Grace Lines, Inc. v. Motley*, 439 F.2d 1028 (2d Cir.1971), a juror told the trial court, during a jury poll, that she had voted for the defendant only because the verdict had to be unanimous. The court declared a mistrial and set a new trial date four days later. The Second Circuit, on a petition for a writ of mandamus, granted the writ and held that the trial court's setting of the new trial date violated Rule 50(b) by depriving the defendant of its right to seek a directed verdict within ten days after the discharge of the jury. *Id.* at 1031 ("the writ of mandamus must issue to afford the defendant the opportunity" to seek a directed verdict under Rule 50(b)); *see id.* at 1034 (Waterman, J., concurring). This case goes directly against appellant's argument that a trial court lacks jurisdiction to direct a verdict after it declares a mistrial.

Appellant also cites *Hill v. W.E. Brittain, Inc.*, 405 S.W.2d 803, 808 (Tex.Civ. App.1966), for the proposition that the trial court must first vacate its order granting the mistrial before it can enter a directed verdict. *Hill* is distinguishable because it was based on Texas case law and a Texas rule of procedure, neither of which has any application to the instant case. *See id.* at 808–809.

Finally, appellant relies on *Village of Lakemoor v. First Bank of Oak Park*, 136 Ill.App.3d 35, 482 N.E.2d 1014, 90 Ill.Dec. 731 (1985), for the proposition that the granting of a mistrial vitiates all prior proceedings and returns the case and the parties to their pre-trial state. Appellant's reading of *Lakemoor* is strained. The trial judge in that case entered an injunction after hearing three days of testimony. Several days later, however, the trial judge

---

4. We went on to reverse the judgment, however, on the ground that the directed verdict had been erroneously granted, *i.e.*, that the evidence raised issues as to the defendant's negligence and the plaintiff's contributory negligence which should have been submitted to the jury.

5. Because Super.Ct.Civ.R. 50 is identical to Fed. R.Civ.P. 50, we may look to decisions of the federal courts interpreting the federal rule as "persuasive authority in interpreting" the local rule. *Vale Properties, Ltd. v. Canterbury Tales, Inc.*, 431 A.2d 11, 13 n. 3 (D.C.App.1981) (citations omitted).

recused himself and declared a mistrial. The appellate court held that the mistrial vitiated the injunction because the injunction "was voided when the trial upon which it was based was terminated." *Id.* at 39, 482 N.E.2d at 1018, 90 Ill.Dec. at 735. Nothing in the court's opinion stands for the proposition that the granting of a mistrial deprives the court of jurisdiction to entertain motions for a directed verdict.

We therefore hold that the express language of Rule 50(b), as well as relevant case law, gave the trial court jurisdiction to entertain and then grant Dr. Hedgepath's motion for a directed verdict after it had declared a mistrial. Appellant's argument to the contrary must be rejected.

### III

■ The admission of expert testimony is committed to the sound discretion of the trial court. Its decision either to admit or to exclude such testimony will be reversed only upon a showing that the decision was clearly erroneous. *Jones v. United States*, 548 A.2d 35, 38 (D.C.1988) (citing cases); *Dyas v. United States*, 376 A.2d 827, 831 (D.C.App.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977). In deciding whether to admit expert testimony, the trial court must determine (1) whether the subject matter is "so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman," (2) whether the witness has "sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth," and (3) whether "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted, even by an expert." *Dyas, supra,* 376 A.2d at 832. If the trial court concludes that the proffered expert testimony does not pass the third part of this test, it must not admit the testimony. *Id.* Stated another way, the third part of the *Dyas* test requires the trial court to determine that the scientific method used by the expert is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States*, 54 App.D.C. 46, 47, 293 F. 1013, 1024 (1923). This part of the test goes to the reliability of the scientific technique involved: "If the technique has gained such general acceptance, we will accept it as presumptively reliable." *Jones v. United States, supra,* 548 A.2d at 39.

■ Dr. Asplin relied solely on his evaluation of the photograph of Mrs. Street in rendering his expert opinion that a physician exercising ordinary skill would have noticed the lump in Mrs. Street's thyroid on October 24, 1985. The trial court ruled that there was no showing that Dr. Asplin had any expertise in drawing such an inference from a photograph. The court also ruled that there was no evidence that making a diagnosis from a photograph was "accepted or used in the medical community...." It then concluded that Dr. Asplin's testimony failed the second and third parts of the *Dyas* test and should not have been admitted.

We hold that the trial court did not abuse its discretion in rejecting Dr. Asplin's testimony. There was no evidence that Dr. Asplin had ever previously determined, from a photograph of any patient, when a physician should have discovered thyroid cancer or that such a determination was generally accepted "in the particular field in which it belongs." *Frye, supra,* 54 App. D.C. at 47, 293 F. at 1014. Appellant does not assert that there was any such testimony, but rather contends that it is "obvious that any trained physician can look at the photograph and see something which should not be there." Appellant offers no support for this conclusory assertion, and it is certainly not "obvious" to us with respect to this particular photograph. Furthermore, appellant needed to show that whatever was visible in the photograph was more than "something which should not be there." He needed to show, specifically, that it was thyroid cancer which a physician exercising ordinary care would have discovered and treated. Dr. Asplin admitted that there were drawbacks in relying on the photograph. He noted that the photograph would not tell him anything

about the texture or consistency of the swelling, and he admitted that he could only speculate that the swelling he saw in the photograph was the tumor that was ultimately removed from Mrs. Street. Given this admission, as well as the lack of any evidence that Dr. Asplin (or any physician) had ever based an opinion on photographs or any evidence that such a technique was generally accepted in the medical community, it was entirely reasonable for the court to conclude that the reliability of this diagnostic technique was highly suspect. Accordingly, we find no error in the trial court's determination that it should not have admitted Dr. Asplin's testimony.[6]

"In a medical malpractice case the plaintiff must prove, generally through expert testimony, that there was an applicable standard of care, that the defendant breached that standard, and that the breach was a proximate cause of the plaintiff's injuries." *Psychiatric Institute of Washington v. Allen*, 509 A.2d 619, 623–624 (D.C.App.1986) (citations omitted). In this case Dr. Asplin's expert testimony was the only evidence that Dr. Hedgepath's conduct breached the applicable standard of care and that this breach proximately caused appellant's injuries. We have held that the trial court properly excluded Dr. Asplin's testimony. It follows that, without Dr. Asplin's testimony, the evidence failed to establish the essential elements of appellant's malpractice claim. The trial court therefore properly directed a verdict in favor of Dr. Hedgepath. *See Kling v. Peters*, 564 A.2d 708, 716 (D.C.App.1989) (because there was "no ... evidence of proximate cause relevant to [one malpractice] claim, we hold that the trial court erred in submitting this claim to the jury"); *Meek v. Shepard*, 484 A.2d 579, 582 (D.C.App.1984) ("Without sufficient proof of the standard of care, [plaintiff's] case should never have gone to the jury" (citations omitted)).

## IV

Appellant challenges the trial court's decision to exclude, on hearsay grounds, testimony from Mrs. Street's relatives as to Mrs. Street's pain and suffering as well as statements that Dr. Hedgepath allegedly made to Mrs. Street. Appellant concedes that because his only remedy, were he to prevail in this appeal, would be a new trial, our determination of this issue would have no effect on "the outcome of any other decisions rendered in this case." He nonetheless urges us to decide these issues because they "will be confronted again by the trial court."

Appellant is unmistakably asking this court for an advisory opinion on the admissibility of evidence at a retrial, if there is one. This court does not generally provide such advisory opinions, *see Jackson v. Condor Management Group, Inc.*, 587 A.2d 222, 226 (D.C.App.1991), and we decline to do so in this case. In any event, there will obviously be no retrial, since we have already held that the court did not err in granting a directed verdict for Dr. Hedgepath.

## V

■ Appellant argues that the trial court erred in not excluding the treating physicians' testimony in the *Hedgepath* case on the ground that it was obtained in violation of the confidentiality of the physician-patient relationship. He also urges us to recognize the tort of "breach of the physician-patient privilege" on the facts alleged in his complaint in the *Georgetown* case. Our decision on both of these points depends upon whether appellant waived the confidentiality of Mrs. Street's relationship with her physicians.

---

6. Appellant asserts that Dr. Asplin did not diagnose the presence of thyroid cancer from looking at the photograph but, rather, that Dr. Asplin "testified that he had the knowledge and training to look at this particular photograph and see something medically significant, which was a swelling in the neck." Appellant contends that Dr. Asplin then determined, through a re- view of the medical records in the case, that this swelling was a manifestation of thyroid cancer. The record does not support these assertions. It is clear from the trial transcript that Dr. Asplin based his entire opinion on the photograph, and that Dr. Asplin admitted as much in his testimony.

██ Like many other jurisdictions, the District of Columbia has created a statutory privilege which prevents physicians from testifying about their patients' medical conditions without the patients' consent. D.C.Code § 14–307 (1989); *see Richbow v. District of Columbia,* 600 A.2d 1063, 1068 (D.C.App.1991). This court, in addition, has recognized a cause of action in tort for a breach of the confidential physician-patient relationship, based on the statutory privilege and on certain licensing statutes which generally prohibit physicians from disclosing patient treatment, except in cases of gunshot wounds and child neglect. "These statutes suggest that the policy in this jurisdiction is to encourage candor by patients and confidentiality by physicians." *Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.,* 492 A.2d 580, 591 (D.C.App.1985). The tort of breach of a confidential relationship consists of the " 'unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship.' " *Id.,* quoting Note, *Breach of Confidence: An Emerging Tort,* 82 COLUM.L.REV. 1426, 1455 (1982).[7]

██ The argument that appellant makes has not yet been addressed by this court, but it has twice been rejected by our local United States District Court, and by other courts as well. *Sklagen v. Greater Southeast Community Hospital,* 625 F.Supp. 991, 992 (D.D.C.1984); *Doe v. Eli Lilly & Co.,* 99 F.R.D. 126, 127 (D.D.C. 1983); *see* 4 J. MOORE, J. LUCAS & G. GROT-HEER, JR., MOORE'S FEDERAL PRACTICE ¶ 26.60 [6], at 222 (2d ed. 1991); 8 J. WIGMORE, EVIDENCE § 2389 (McNaughton rev.1961). The court held in *Sklagen:* "By placing her physical condition in issue through the filing of this lawsuit, plaintiff has waived her privilege against disclosure of relevant medical evidence." 625 F.Supp. at 992 (citations omitted). The waiver is not unlimited in scope. Rather, as *Sklagen's* reference to "relevant medical evidence" implies, it extends only to medical information relevant to the malpractice claim.

We agree with the holding in *Sklagen* and adopt it here. It is clear from the complaint in the *Georgetown* case that the alleged communication between the physicians and Dr. Hedgepath's attorney occurred after the complaint in the *Hedgepath* case was filed. Accordingly, following *Sklagen* and *Doe,* we hold that appellant waived any privilege against disclosure of "relevant medical evidence" about Mrs. Street by filing suit in the *Hedgepath* case.

██ Appellant maintains that even if he did waive the privilege by filing suit, *ex parte* interviews with the treating physicians should be prohibited to "guard against breaching the limited waiver." We need not address this contention, for appellant did not even allege below that the communications between the doctors and the attorney ever exceeded the scope of the waiver. Appellant asserted only that "[f]rom these *ex parte* contacts, [the attorney] was able to entreat from [the doctors] the opinion that even had Hedgepath made timely discovery of the cancer, Victoria Street would not have survived." This testimony was clearly relevant to the *Hedgepath* case, since it addressed the central issue of whether Dr. Hedgepath's alleged negligence proximately caused Mrs. Street's injury. We therefore conclude, in the absence of any evidence to the contrary, that the disclosure by the doctors of medical information about Mrs. Street's cancer did not go beyond the legal limits of the waiver. Accordingly, we examine the effect of this waiver on appellant's challenges to the trial court's denial of his motion to exclude the testimony of the treating physicians in the *Hedgepath* case and the dismissal of the complaint in the *Georgetown* case.

---

7. The *Vassiliades* case illustrates the sort of conduct that may give rise to liability. In *Vassiliades* a plastic surgeon, without the plaintiff's consent, disclosed to third persons the fact that the plaintiff had undergone plastic surgery. The plaintiff knew some of the third persons and was highly embarrassed by the disclosure. This court held that the trial court had erred in directing a verdict for the physician, holding that the plaintiff had presented sufficient evidence to prove a breach of the physician-patient relationship (although we held that the error was harmless for other reasons).

### A. The admission of the doctors' testimony in the *Hedgepath* case

■ Appellant contends that the jury should not have been allowed to hear the testimony of Drs. Earll and Dillon, Mrs. Street's treating physicians, on the ground that they had breached the confidentiality of the doctor-patient relationship by having *ex parte* conversations with Dr. Hedgepath's attorney, Mr. Hamilton. Their testimony should have been excluded, he maintains, not because the information it contained was not discoverable, but because it was obtained in an *ex parte* interview. Appellant argues that the trial court had a duty to prevent or sanction *ex parte* interviews between treating physicians and attorneys. The same contention was rejected by the court in *Doe v. Eli Lilly & Co.*, *supra.* In that case, a product liability action against the manufacturer of a drug, the plaintiffs refused to waive their privilege in a manner that would allow *ex parte* contacts between their physicians and the defendant's attorney. The plaintiffs contended, as appellant does here, that the only way to allow access to the physicians was through depositions. The court declared, in rejecting this argument:

> As a general proposition, however, no party to litigation has anything resembling a proprietary right to any witness's evidence.... Even an expert whose knowledge has been purchased cannot be silenced by the party who is paying him on that ground alone. Unless impeded by privilege, an adversary may inquire, in advance of trial, by any lawful manner to learn what the witness knows ... and while the Federal Rules of Civil Procedure have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the venerable, if informal, discovery techniques as the *ex parte* interview of a witness who is willing to speak....

... The [physician-patient] privilege was never intended ... to be used as a trial tactic by which a party entitled to invoke it may control to his advantage the timing and circumstances of the release of information *he must inevitably see revealed at some time.*

99 F.R.D. at 128 (citations omitted and emphasis added); *see also Sklagen v. Greater Southeast Community Hospital, supra,* 625 F.Supp. at 992. *See generally Gregory v. United States,* 125 U.S.App.D.C. 140, 143, 369 F.2d 185, 188 (1966) (witnesses "are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.").

■ There is no doubt that Dr. Hedgepath's attorney could have obtained by deposition the information that he apparently got in the *ex parte* interview. We adopt the holding in *Doe,* and conclude that *ex parte* interviews with a treating physician are a permissible means of informal discovery when the plaintiff has put the medical condition of that physician's patient at issue by filing a lawsuit. There is no legal basis for excluding the doctors' testimony solely because it was discovered in an *ex parte* interview.[8]

### B. The complaint in the *Georgetown* case

■ Appellant challenges the trial court's dismissal of his complaint in the *Georgetown* case under Super.Ct.Civ.R. 12(b)(6) for failure to state a claim. He contends that the trial court's order dismissing the case was actually an order granting summary judgment because the parties submitted affidavits and other matters outside of the complaint. We do not agree, for the complaint on its face demonstrates that it must be dismissed.

"The Rule 12(b)(6) motion, like its common-law ancestor, the general demurrer, is intended solely to test the legal sufficiency of the complaint." *American Insurance Co. v. Smith,* 472 A.2d 872, 873–874

---

**8.** Nothing in our holding should be read to preclude the trial court from limiting *ex parte* contacts between defense attorneys and potential witnesses when requested to do so by either party. *See, e.g., Alston v. Greater Southeast Community Hospital,* 107 F.R.D. 35, 38 (D.D.C. 1985). In this case, however, appellant never asked the court to impose any such limits.

(D.C.App.1984). "Dismissal under Rule 12(b)(6) is warranted only when 'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.' ... For the purposes of a Rule 12(b)(6) motion, [the plaintiffs'] complaint must be construed in the light most favorable to their claim, and their allegations must be accepted as true." *Klahr v. District of Columbia*, 576 A.2d 718, 721 (D.C.App.1990) (citations omitted). We hold that the complaint in the *Georgetown* case, even when read in the light most favorable to appellant, is legally insufficient to state a cause of action for breach of a confidential relationship.

 The tort of breach of a confidential relationship occurs only upon the *unconsented* disclosure of confidential information. *Vassiliades, supra,* 492 A.2d at 591. The lack of consent to the disclosure is an essential element of the tort. There is no cause of action under *Vassiliades* when the plaintiff waives the privilege, for the waiver of the privilege is, as a matter of law, a consent to the disclosure of the information.

 By filing a medical malpractice action against Dr. Hedgepath, appellant waived his privilege against disclosure of any relevant medical information about Mrs. Street's condition. Consequently, when he alleged in his complaint in the *Georgetown* case that he had filed the *Hedgepath* case, appellant necessarily acknowledged that he had waived the privilege by doing so, *i.e.*, that he had consented to the disclosure of otherwise privileged information. Thus appellant's complaint contains his own admission, which we must accept as true, that he consented to the disclosure of the information about his late wife's medical condition and treatment. Because there can be no recovery for breach of a confidential relationship when there is consent to the disclosure, appellant's complaint fails to state a claim. The trial court therefore properly dismissed it under Rule 12(b)(6).[9]

## VI

We affirm the trial court's grant of a directed verdict and the denial of appellant's motion to exclude the testimony of Mrs. Street's treating physicians in the *Hedgepath* case. We also affirm the trial court's dismissal of appellant's complaint in the *Georgetown* case.

*Affirmed.*

9. Appellant contends that he stated a claim for nominal damages, and that he may therefore recover punitive damages. *Vassiliades* makes clear, however, that punitive damages are recoverable only when there is a basis for compensatory damages as well. *Vassiliades, supra,* 492 A.2d at 593; *accord, Zanville v. Garza,* 561 A.2d 1000, 1001–1002 (D.C.App.1989) (citing cases). Because the complaint failed to state a cause of action, there is no basis for any damages in the *Georgetown* case, compensatory or punitive.