James A. BROWN, Appellant,

v.

UNITED STATES, Appellee.

No. 12161.

District of Columbia Court of Appeals.

Argued Oct. 11, 1978.

Decided Dec. 19, 1979.

---

Thomas W. Ullrich, Alexandria, Va., appointed by this court, for appellant.

Michael W. Farrell, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, Steven R. Schaars and Joseph B. Valder, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEBEKER and FERREN, Associate Judges, and YEAGLEY, Associate Judge, Retired.

YEAGLEY, Associate Judge, Retired:

A jury found appellant guilty of rape (D.C. Code 1973, § 22–2801). On appeal, he asserts reversible error was committed because (1) he was denied his right to call witnesses in his own behalf and to provide exculpatory evidence; and (2) his Sixth Amendment right to confrontation was unconstitutionally abridged by the trial court's undue limitation of his right to impeach the complainant's credibility by cross-examination. We have considered appellant's claims and find no errors nor abuse of discretion which warrant reversal. Accordingly, we affirm his conviction.

Appellant and Joseph Wormley were friends of the complainant's husband. On March 5th and 6th, 1976, both appellant and Wormley stayed at the complainant's apartment, sleeping in the living room while complainant and her husband slept in their bedroom. Early in the morning of March 7, complainant's husband, appellant, and Wormley left the apartment together. Complainant's husband never returned and was later found murdered in Virginia.[1]

At trial, the complainant testified that later the same day, but before she knew of her husband's death, appellant returned to her apartment. With her permission, he stayed in the apartment for the next two days, sleeping on the living room sofa. During that time he made various statements to her concerning the whereabouts of her husband, although at no time did he tell her that her husband was dead. As time passed, the combination of her husband's continued absence and appellant's changing stories about the cause of his absence made her afraid and suspicious of appellant. On March 8, at approximately 3:00 p.m., she and appellant argued briefly but violently over her husband's whereabouts. Suddenly appellant attacked and raped her. During the attack appellant choked her, the choking causing her to bleed heavily from her mouth and throat.

After the rape, appellant heard voices in the hallway outside the apartment including the voice of the victim's sister-in-law. She screamed for help but once more appellant choked her, again causing her to bleed from her nose and mouth, and this time also making her lose consciousness. When she awoke, she again heard her sister-in-law and another woman calling to her and knocking at her bedroom window. She went to the front door of the apartment and let them in. Apparently appellant had left by then, but because the complainant was unsure of his departure, she was afraid to tell the other two women what had happened to her. In the meantime, her sister-in-law helped the complainant bathe and dress. Then she and the other woman took complainant to the house of complainant's mother-in-law. On the drive there, complainant told the two women she had been raped by "Ambrose," which is appellant's nickname.

The complainant learned of her husband's murder shortly after she arrived at her mother-in-law's. By then, the police had been summoned and they arrived soon thereafter.

Complainant's sister-in-law and her companion testified at appellant's trial. Their testimony corroborated those portions of the complainant's testimony regarding the events which transpired from the time complainant first heard their voices outside her apartment, including the fact that they heard complainant's screams. In addition, both women testified that before entering the apartment building they saw a man walking away from it. Each woman noticed his clothes and later was able to give a general description of him to the police, but

1. Before his trial for rape commenced, appellant was found guilty in Virginia for the murder of complainant's husband. His death was revealed to the jurors in appellant's rape trial, but the fact that he was murdered by appellant was not.

neither woman saw his face or was otherwise able to identify him.[2]

■ The results of the police investigation of the alleged rape were presented at trial, including photographs of the apartment as it looked immediately after the attack, photographs of complainant's injuries, and photographs of the bed sheets and bedspread. The police testified that when they arrested appellant one day later, they found blood stains on his shirt, pants and shoes, and that he had scratch marks on the back of his hands that could have been made by fingernails. Dr. Maria Peterson, who was qualified by the court as an expert in gynecology and obstetrics,[3] testified that she had examined the complainant on March 8th after the alleged rape, and found her nervous, agitated, and angry, and had discovered injuries to her neck and eyes which were caused by a "tremendous amount of pressure" applied to the blood vessels of her neck. There also was testimony as to the presence of intact sperm within her vagina after the rape. In the doctor's opinion, the complainant was the victim of forced vaginal intercourse.

An FBI special agent, an expert in forensic seriology, testified that blood discovered on appellant's clothing after his arrest could have come from either appellant or the complainant. Another special agent, an expert in forensic analysis and identification of hair and fiber, testified that foreign pubic hair mixed with pubic hair taken from the complainant matched a sample of pubic hair later taken from appellant. In addition, both sides stipulated that numerous fingerprints of appellant were found throughout the apartment.

## I. THE ATTEMPT TO PRESENT EXCULPATORY EVIDENCE.

In light of the overwhelming evidence that appellant and the complainant had engaged in sexual intercourse, appellant presented an alternative defense at trial to the effect that the complainant had consented to their intercourse, and if she was raped it was after their liaison and by someone else, most probably Joseph Wormley. As part of the effort to establish these defenses, appellant's counsel alerted the trial judge that he wished to call Joseph Wormley as a defense witness to testify that at the funeral of complainant's husband, the complainant had seen Wormley and became hysterical. Wormley had already testified as a government witness in its case-in-chief and had stated that appellant told him that he, appellant, was going to "take the place" of complainant's husband. Both Wormley and the complainant had also testified that Wormley had returned to complainant's apartment before she allegedly was raped by appellant, and that at that time appellant was asleep on the living room couch. The trial judge refused to allow Wormley to testify for the defense, ruling that his proffered testimony was ambiguous and irrelevant and thus not probative.

Appellant claims that Wormley's proffered testimony, as well as other evidence presented or proffered at trial, linked Wormley to the supposed rape, and that the trial court's refusal to allow Wormley to testify for the defense therefore denied appellant his due process right to call witnesses in his own defense and to establish his own innocence by proving that another person was guilty of the crime.[4]

2. Complainant's sister-in-law had known appellant for some time, although her friend did not know him at the time of the alleged rape.

3. Appellant also claims the trial court committed error by qualifying Dr. Peterson as an expert in gynecology and obstetrics when she had not completed her specialty studies in those areas at the time of trial. The same issue was presented to this court in *Grady v. United States*, D.C.App., 376 A.2d 437, 438 n. 1 (1977). We held then, as we do now, that the trial court

did not err in qualifying the witness and the testimony, including the physician's opinions, was not erroneously received by the court.

4. Besides Wormley's proposed testimony, the major items of evidence which appellant suggests point to Wormley's guilt were: (1) the fact that Wormley maintained a close relationship with the complainant and her husband; (2) the testimony that Wormley returned to the complainant's apartment while appellant was staying there; (3) the failure of complainant's

Of course, the accused in a criminal prosecution has a fundamental right to call witnesses in his own defense. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Evidence that someone other than the accused has committed the crime for which the accused is charged may be presented through the testimony of defense witnesses when there are sufficient indicia that the evidence is reliable. *Chambers v. Mississippi, supra*, 410 U.S. at 298–303, 93 S.Ct. 1038. One commentator has stated the rule to be: "When guilt of another person is inconsistent with the guilt of the defendant, it is always relevant for the defendant to present evidence that such other person committed the crime." 1 Wharton's Criminal Evidence § 195 at 404 (13th ed. 1972). However, before evidence of the guilt of another can be deemed relevant and thereby admissible, the evidence must clearly link that other person to the commission of the crime. *See, e. g., State v. Perelli*, 125 Conn. 321, 5 A.2d 705 (1939); *White v. State*, 52 Nev. 235, 285 P. 503 (1930). Even when such evidence is relevant, the trial court must weigh its probative value against its prejudicial impact, including its propensity to mislead the jury or confuse them, to determine whether to admit the evidence. *Punch v. United States*, D.C.App., 377 A.2d 1353, 1358 (1977). The record reflects that the trial court has weighed these factors before reaching its decision to admit or exclude the evidence. We will not overturn that decision absent a clear abuse of discretion. *Id.*

We cannot say that the trial court erred in holding that Wormley's proposed testimony—that the complainant became hysterical when she saw him at her husband's funeral—was irrelevant. At best it was a description of an ambiguous act. In fact, it would have been reasonable for the trial court to interpret her reaction as an indication that she believed Wormley was involved in her husband's murder, since at the time of the funeral she knew her husband had been murdered and the last two people she had seen with her husband while he was alive were appellant and Wormley. The prosecutor pointed out that if Wormley's testimony was admitted to support the inference as proffered, the prosecutor would have to bring out Wormley's connection to the Williams murder to establish the alternative explanation for the widow's reaction.

The record reflects that the court considered the extremely prejudicial impact such evidence would have. Moreover, both counsel and the court had been careful throughout the trial not to allude to the fact that complainant's husband had been murdered or that appellant was involved in the murder. Accordingly, we find no abuse of discretion by the trial court in excluding Wormley's testimony concerning the funeral incident. We have also considered the other evidence which appellant contends would have been probative of Wormley's guilt, but find each contention to be without merit. *See* note 4, *supra*.

## II. THE RESTRICTIONS ON DEFENSE COUNSEL'S CROSS–EXAMINATION OF THE COMPLAINANT.

During her direct testimony, the complainant stated that when appellant stayed in her apartment after his return in March he offered various explanations for her husband's absence. Among these were that her husband had been arrested by the police because they found him with a large quantity of drugs on his person and that he had gone to Connecticut with two other women. In addition, the complainant testified that appellant told her she "deserved better" than her husband. After the complainant related each of these statements supposedly made to her by appellant, the

sister-in-law to identify appellant as the man who left complainant's apartment, although she knew appellant very well; and (4) the fact that Wormley was a thrice-convicted felon awaiting sentencing for armed robbery at the time of trial. In addition, one Gregory B. Hawkins testified for the defense that Wormley told him that he, Wormley, and not appellant, was going to take the place of complainant's husband.

prosecutor asked further questions enabling her also to testify that she had never known her husband to use drugs and that she did not believe she deserved better than her husband "[b]ecause I had everything that I wanted you know, with my husband."

On cross-examination defense counsel sought to explore those areas of the complainant's direct testimony mentioned above and to further delve into the question of consent. He asked whether everything was financially well on March 6th and she replied it was not. However, when counsel then asked her whether they were about to be evicted at the time of the alleged rape the prosecutor objected to the question and the objection was sustained by the court. Counsel then asked whether the couple had been three months behind in their rent, but the court also sustained the prosecutor's objection to this question. Finally, counsel asked the complainant whether the couple had been short of money, and once more the court sustained the prosecutor's objection. A bench conference was then called at which the following occurred:

THE COURT: Mr. Ullrich, will you please tell me for my own information what this lady's financial condition has to do with this case?

MR. ULLRICH: Certainly, Your Honor. Mr. Valder opened the door. He brought out a great deal of testimony regarding whether or not everything was fine between her and her husband. They have pictured her marriage as an ideal marriage with no problems whatsoever. However, that is not the case. Her husband was running around on her. He was also a junky. He was enrolled at the NTA Narcotics Clinic. He was also abusing her and she was using drugs, too.

THE COURT: Sir, what does that have to do with this case?

MR. ULLRICH: Because, Your Honor, Mr. Valder opened the door.

THE COURT: Well, sir, even though he may have opened the door, what does that have to do with the case? Those were merely irrelevant questions that were asked by Mr. Valder that you did not object to.

MR. ULLRICH: That's right.

THE COURT: Sir, but it does not give you a license to impose ad infinitum on irrelevant areas.

MR. ULLRICH: Your Honor, our position is that she was seeking other avenues and that she was very much dissatisfied with her marriage.

THE COURT: Sir, her financial condition has nothing to do with this case and the objection to that last question is sustained and you are asked hereby not to pursue that matter.

When cross-examination resumed, defense counsel asked the complainant whether she knew what Valium was. The prosecutor's objection to this question was sustained. Counsel then asked whether complainant's husband was a junky. Again, the court sustained the prosecutor's objection and called another bench conference. At this bench conference, defense counsel advised the court that Joseph Wormley had told him that the complainant was a frequent drug user, but earlier when counsel had asked this question of Wormley on cross-examination, he told the court he had learned this from his client. He also said appellant had informed him that he and the complainant had used drugs while appellant stayed in her apartment. Counsel also stated that he had evidence that drugs always were available in the apartment, but that the complainant had denied these allegations. The court reiterated that the objection to the question was sustained.

Later, during cross-examination, the court allowed defense counsel to inquire whether the complainant had asked her husband where he was going when he left the apartment with appellant and Wormley, but the court prohibited the complainant from answering counsel's subsequent question whether it was unusual for her husband to leave the house late at night without explanation. Still later, the court permitted the complainant to answer whether she had smoked "pot" with appellant during his stay (she said she had not), but refused to allow her to answer the question whether

she had ever smoked pot. Counsel was allowed to ask, and he received affirmative responses from the complainant, to the following questions: (1) Whether she was surprised when told that her husband had gone to Connecticut with two girls; (2) Whether she was surprised when told that her husband had been arrested; and (3) Whether she had made any attempt to find out why her husband had been arrested.

Counsel also was allowed to inquire about appellant's staying in the apartment with her and her husband in early March; whether she and her husband lived together before they were married; whether Brown had caused her any problem while staying at their apartment from Tuesday to Saturday; whether he abused her in any way; and whether she ever asked Brown to leave. But the court sustained objections by the prosecutor when the defense asked whether the complainant had attempted to find out why her husband had been arrested at the time appellant told her he had been, and what her feelings were when told by appellant that her husband had gone to Connecticut with the two girls.

Appellant contends that the restrictions placed on cross-examination prevented effective impeachment of the complainant's credibility seriously hindered establishment of his defense of consent, and thereby unconstitutionally abridged his Sixth Amendment right to confrontation.

The cross-examination of the victim was not cut off in limine. The trial court tried to be selective in permitting answers to some questions and sustaining objections to a number of others. We thus conclude that reversible error is not established.

One question was allowed as to their financial situation and one question regarding her smoking pot with appellant. Neither area would appear to be of any particular relevance except that on direct examination she had said without objection that she had not known her husband to use drugs and that she "had everything that I wanted you know." The latter reply is both vague and nonspecific. It does not indicate whether she was referring to material

goods or to happiness and contentment in marriage. Its relevance is marginal. If it referred to material goods, we note that appellant was allowed to ask one question as to whether everything was all right with their financial condition in early March. If it referred to her marriage relationship, we note that a fair amount of testimony came out regarding their life style but nothing regarding her opinion of their marriage.

 Cross-examination, like direct examination, is governed by the rule of relevancy. *Moss v. United States*, D.C.App., 368 A.2d 1131, 1135 (1977). Relevancy means that the evidence offered will tend to establish a material proposition in the case. *See* McCormick, *Evidence* § 185 (1972 ed.). An exception to the long list of potential avenues of cross-examination which are prohibited by operation of the rules of relevancy is cross-examination for the purpose of evaluating the credibility of the witness and the evidence supplied by the witness's direct testimony. The test of relevancy for this purpose is not necessarily whether the response sought from the witness will shed light on a material issue, but whether the answer will assist the trier of fact in evaluating his credibility and in assessing the probative value of the witness' direct testimony. *Id.* at § 29.

 Counsel should be given the opportunity to demonstrate that the witness's statements on direct examination were untrue and thereby show that the witness lacks veracity. This does not mean that cross-examination on matters brought out on direct examination cannot be limited. As he is empowered to do with all subjects which may be initially explored on cross-examination, the trial judge may cut off further inquiry in his discretion, if the cross-examination becomes repetitive, protracted or cumulative. · *Id. United States v. Pugh*, 141 U.S.App.D.C. 68, 70, 436 F.2d 222, 224 (1970).

 The trial judge is given considerable discretion to control cross-examination if he concludes the danger of the unfair or prejudicial effect of the evidence

outweighs its probative value. *Smith v. United States*, D.C.App., 392 A.2d 990, 991 (1978). The basic right is subject to reasonable regulation by the trial court. Its regulation lies within the discretion of the trial court and reversal is warranted only where an abuse of discretion leads to prejudice. *Best v. United States*, D.C.App., 328 A.2d 378 (1974); *Howard v. United States*, 128 U.S.App.D.C. 336, 341, 389 F.2d 287, 292 (1967).

In *Springer v. United States*, D.C.App., 388 A.2d 846, 855–57 (1978), we created a framework by which to evaluate errors based upon the undue restriction of cross-examination. We stated:

> Thus, in reviewing claims of error based upon the trial court's excessive restriction of cross-examination, the standard of review employed by this court will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial. We will first examine the record to determine whether any such error committed is of constitutional dimension—*i. e.*, whether the trial court has permitted sufficient cross-examination to comport with the requirements of the Sixth Amendment right to confrontation. Where examination of the record shows that the trial court's curtailment of cross-examination rises to the level of abridgement of the defendant's constitutional right to effective cross-examination, we must then decide whether such constitutional error by the trial court is of such magnitude as to require reversal per se, . . . or whether such error may be considered harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 . . . (1967) . . . .

\* \* \* \* \* \*

Of course, the trial judge may always limit cross-examination "to preclude repetitive and unduly harassing interrogation," *Davis v. Alaska, supra,* 415 U.S. [308] at 316, 94 S.Ct. 1105, 39 L.Ed.2d 347, . . . or to prevent inquiry into matters having little relevance or probative value to the issues raised at trial, *Miles v. United States*, D.C.App., 374 A.2d 278 (1977). [Citations omitted.]

While the court allowed answers to only a few of counsel's questions on these matters and precluded answers as to many others, they were on collateral issues, and, while having some bearing on general credibility, did not bear on the witness's bias and could have had only a minimal effect, if any, on the outcome of the case. The denial certainly did not rise to constitutional proportions. The evidence, both physical and oral, corroborating her testimony of forcible rape was so strong and covered such a broad spectrum that it is highly doubtful that further cross-examination on her financial or family situation would have undermined her testimony in the mind of a reasonable juror.

In *Johnson v. United States,* D.C.App., 398 A.2d 354, 362 (1979), we discussed our role in analyzing the discretion exercised by the trial court. We said:

> Matters are committed to the discretion of the trial court and reviewed only for abuse of that discretion to reap the benefits of certain perspectival and institutional advantages. Several of the most important reasons for deferring to the trial judge's exercise of discretion [are] his observation of the witnesses, his superior opportunity to get "the feel of the case," *see Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 . . . (1947), and the impracticality of framing a rule of decision where many disparate factors must be weighed, *see Atchison, T. & S.F. Ry. v. Barrett,* 246 F.2d 846 (9th Cir. 1957) . . . [*Noonan v. Cunard Steamship Co.,* 375 F.2d 69, 71 (2d Cir. 1967) (Friendly, J.).]

After an analysis of the trial court proceedings guided by *Johnson* principles, we cannot say that the trial court abused its discretion in rejecting defense contentions

that the requested line of questioning would demonstrate to the jury credibility impeachment of the witness and amplify the defense of consent. The court afforded counsel substantial latitude in allowing him to support his contentions during several bench conferences and the ultimate defense of consent was fully aired. In sum, we cannot say on this record that the restriction of cross-examination here constituted an abuse of the trial court's discretion. Finding no other reversible error, the judgment appealed from is

*Affirmed.*