Cornelius O. NELSON, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–987.

District of Columbia Court of Appeals.

Argued Nov. 15, 1993.
Decided Oct. 31, 1994.

Clark U. Fleckinger, II, appointed by this court, Silver Spring, MD, for appellant.

Steven J. Durham, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty., at the time the brief was filed, John R. Fisher, and Wanda G. Bryant, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before WAGNER,* Chief Judge, and STEADMAN, and SCHWELB, Associate Judges.

WAGNER, Chief Judge:

Appellant, Cornelius Nelson, was convicted following a jury trial of one count of carnal knowledge of a child under sixteen years of age in violation of D.C.Code § 22–2801 (1989), and one count of taking indecent liberties with a minor child in violation of D.C.Code § 22–3502(a) (1989). Appellant argues for reversal on the grounds that the trial court erred in: (1) restricting the scope of his cross-examination and argument into areas intended to show that a specific third person committed the offenses for which appellant was on trial; (2) precluding cross-examination of a witness about his perception of the meaning of a statement made by the complainant's mother when she first learned of the sexual assaults; (3) failing to compel disclosure of the complaining witness' medical and psychiatric counseling records of examinations or treatment after the offenses were committed; and (4) denying his Batson[1] challenge that the government exercised its peremptory challenges for gender discriminatory reasons. Finding no reversible error, we affirm.

## I.

### Factual Background

We recount in this section the evidence presented at trial related to the commission of the crimes. The minor complainant, M.D., was eight years old at the time the offenses were committed on or about August 25, 1988. She was living with her mother, Risa Washington, her four year old brother and her mother's male companion, Peter Bolding, in an apartment in Southeast Washington. Appellant's sister, Lyn Nelson, was Ms. Washington's friend and neighbor, who lived in the same building. The two women would often babysit for each other, and M.D. played fre-

quently at the Nelson apartment with Ms. Nelson's daughter, Montekea. Ms. Washington knew appellant, who was Lyn Nelson's brother, as "Pete" Nelson. Around August 25, 1988, at Ms. Nelson's request, she had let appellant into the Nelson apartment to take a shower.

According to M.D.'s testimony, one day in 1988 appellant was at the Nelson apartment, and he gave the children money to go to the store to purchase food. M.D. said she had seen appellant before in his ice cream truck, a fact which was confirmed by Montekea. When the children returned to the apartment, they went into Montekea's bedroom, but appellant called M.D. into the kitchen, ostensibly to get some napkins. M.D. said that "the lights were out and [appellant] was sitting in the chair." M.D. recounted that appellant pulled down his pants and her pants and fondled her vaginal area. According to M.D., appellant touched her with "his privacy and his hand," and placed his hand and "his privacy" inside her "privacy." At trial, she demonstrated what occurred with anatomical dolls. Thereafter, appellant called Montekea into the kitchen and asked her to turn on the lights and bring him a beer.

Shortly after this incident, M.D. experienced pain on urination and noticed a yellowish-green substance on her underpants. That summer, while Ms. Washington and Ms. Nelson were doing laundry, Ms. Nelson also noticed a "very heavy discharge" in M.D.'s underwear, and she recommended that Ms. Washington take the child to see a doctor. Ms. Washington told Ms. Nelson that she thought the substance came from a sore on M.D.'s leg. Nevertheless, Ms. Washington took M.D. to her regular physician, Dr. Byung Lee.[2]

Dr. Lee, an expert in pediatric medicine, testified at trial that he examined M.D. on September 21, 1988 and observed what appeared to be symptoms of a sexually trans-

---

* Judge WAGNER was an Associate Judge of this court at the time of argument. Her status changed to Chief Judge on June 14, 1994.

1. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. M.D., Dr. Lee, and Ms. Nelson all testified that M.D. went to Dr. Lee for a physical examination for school. However, Ms. Washington testified that she took the child to seek treatment for the vaginal infection.

mitted disease. He took a culture and submitted it to a laboratory for examination to determine the cause of the infection. The results of the analysis showed that M.D. had gonorrhea. On September 28, 1988, Dr. Lee reported the test results to the police and told them that "there is no doubt [complainant] has gonorrhea due to [being] sexually abused." He also so testified at trial.

Dr. Elizabeth Keane, another expert in pediatric medicine, particularly sexual abuse cases, testified that she examined M.D. at Children's Hospital on September 26, 1988. Dr. Keane also observed symptoms of infection and took a culture. The results of the culture showed that the child had gonorrhea, and Dr. Keane gave the opinion that such a finding indicates that the "child has been sexually abused." Dr. Keane also recounted that M.D. became tearful and shook her head to indicate a negative response when asked whether anyone had touched her. However, Dr. Keane also said that it was not unusual for a child of M.D.'s age to deny initially any sexual contact.

During his testimony at trial, appellant denied ever having gonorrhea, any venereal disease, or any sexual contact with the child. Another witness testified that she had a sexual relationship with appellant between July and November of 1988, that they had unprotected sexual relations frequently, that she never contracted any venereal disease during that period, and that she saw no evidence that appellant had any such disease. A witness from the Sexually Transmitted Disease Control Program (CDC) testified that CDC's records reflected no reports for appellant for a sexually transmitted disease. However, this witness stated that the CDC would have such records only if the person was tested and treated by a physician who, in fact, reported it to them.

## II.

*Claimed Restriction of Cross–Examination*

■ Appellant argues first that the trial court abused its discretion in limiting cross-examination which was intended to show that another individual committed the crimes charged. Appellant contends that the trial court's ruling in this regard violated his Sixth Amendment right to explore matters which would contradict, modify, or explore the witnesses' testimony. *See Goldman v. United States,* 473 A.2d 852, 857 (D.C.1984) (citing *Morris v. United States,* 398 A.2d 333, 339 (D.C.1978)). He also contends that the court's ruling violated his due process right to present the defense that a specific third person committed the crimes. *See Brown v. United States,* 409 A.2d 1093, 1097 (D.C. 1979). We find no abuse of discretion in the trial court's ruling.

■ Unquestionably, the accused's rights to confront and cross-examine the witnesses against him or her are essential to due process. *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *see also Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *Johnson v. United States,* 552 A.2d 513, 516 (D.C.1989). However, these rights are not absolute, but rather are subject to the strictures of relevancy or "to accommodate other legitimate interests in the criminal trial process." *Chambers,* 410 U.S. at 295, 93 S.Ct. at 1046; *Brown, supra,* 409 A.2d at 1097.

■ A defendant may present evidence which tends to show that another person committed the crimes charged. *Freeland v. United States,* 631 A.2d 1186, 1189 (D.C. 1993); *Watson v. United States,* 612 A.2d 179, 182 (D.C.1992); *Johnson, supra,* 552 A.2d at 516. However, before such evidence can be deemed relevant it must "clearly link" the other person to the commission of the crime. *Brown, supra,* 409 A.2d at 1097. As we subsequently have explained, this perhaps somewhat misleading phrase means simply "proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." *Johnson,* 552 A.2d at 516. In determining whether to admit such evidence, even if relevant, the trial court must weigh its probative value against its prejudicial effect, including any tendency to mislead or confuse the jury. *Id.; accord, Watson,* 612 A.2d at 182; *Brown,* 409 A.2d at 1097.

Appellant contends he was restricted in his efforts to show that it was Peter Bolding, the man who lived with the minor child and her mother during the critical time, who committed the offense. The minor complainant, M.D., testified during cross-examination that Peter Bolding had been living with her family for about two years and was still living with them at the time of trial. She also testified that she regarded Bolding as a father and that "maybe" she loved him.

Although appellant concedes that there was no direct evidence linking Bolding to the crimes charged, he argues that there was sufficient circumstantial evidence to support his efforts to establish this defense. According to appellant, that circumstantial evidence consisted of the following: (1) that Bolding's first name, Peter, was the same as the name by which appellant was known; (2) that the child had affection for the father figure who resided in her home; (3) that she delayed, and was reluctant in acknowledging abuse; (4) that her mother initially expressed disbelief that appellant had committed the offenses; and (5) the child's mother sent her to live with her grandmother after the incidents and made a statement to a police officer that she would kill the perpetrator of the crimes.

After a hearing outside of the presence of the jury and a review of the evidence related to the child's identification of the person who committed the offense, the trial court precluded appellant's trial counsel from questioning M.D. about the possibility of Bolding's involvement. In precluding the inquiry, the court was persuaded, and the record supports, that M.D. had identified appellant in specific terms as the person who committed the offense, including providing the name of appellant's sister. The court also found significant that the child had stated that she did not know where her attacker lived, and M.D. obviously knew that Bolding lived with her. The trial court concluded that the proposed line of questioning was no more than unsubstantiated speculation.

The court held a second hearing outside of the presence of the jury concerning the remark that the child's mother, Ms. Washington, made to a police officer that she would

kill the person who committed the offense. The officer testified that Ms. Washington did not refer to anyone by name. Ms. Washington testified that she did not know who the perpetrator was and that she did not recall to whom she might have been referring when she made the remark. The trial court determined that there was no basis for appellant's trial counsel to explore further with the officer or with Ms. Washington whether Bolding had committed the offenses. The court pointed out that the mere opportunity, which was, in effect, the basis for appellant's position, was insufficient to allow appellant to suggest that a specific person, Bolding, committed the offenses.

On the basis of this record, we find no abuse of discretion in the trial court's rulings. The court could permissibly take the view that the evidence proffered fell short of the relevancy requirement that it sufficiently link the third person to the commission of the crime. *See Watson, supra,* 612 A.2d at 182; *Johnson, supra,* 552 A.2d at 516; *Brown, supra,* 409 A.2d at 1097. While there is no requirement that the evidence prove or raise the strong probability that someone other than the defendant committed the crime, the evidence should

> *tend to* create a reasonable doubt that the defendant committed the offense. In this regard our focus is on the effect the evidence has upon the defendant's culpability and *not* the third party's culpability.

*Johnson,* 552 A.2d at 517.

The suspicion engendered by mere opportunity because Bolding resided in the home with the child could be deemed insufficient to create the requisite link to the offense or to have any legitimate effect on appellant's culpability. *See Watson, supra,* 612 A.2d at 185 ("Merely placing someone similar in dress and physical size to appellant close to appellant at the time of the charged crimes . . . is 'innocuous, innocent type activity . . .' which invites jury speculation") (quoting *Johnson, supra,* 552 A.2d at 516). Other than the fact he resided in the household, there was no evidence linking Bolding to any crimes against the child.[3] Given the particular cir-

---

**3.** This case thus is quite unlike *Freeland, supra,* 631 A.2d at 1189, where the proffered evidence

cumstances, we find no abuse of discretion in the trial court's ruling.[4]

■ Appellant also argues that the trial court should have allowed further cross-examination of the police officer about the statement of the minor complainant's mother when she learned that her child had been abused because it was an excited utterance which reflected on her state of mind. At trial appellant sought to elicit from the officer that Ms. Washington must have suspected that Bolding had committed the offense. The trial court properly foreclosed an examination which required the witness to speculate about the meaning associated with Ms. Washington's statement, concluding that "[i]t was just pure speculation on the officer's part that [Ms. Washington] was thinking of a person rather than thinking whoever that dastardly person was, I will kill him when I see him if I ever find out who it is."

■ Extra-judicial statements which reveal the declarant's state of mind may be admitted as evidence when that individual's state of mind is in issue. *Nelson v. United States,* 601 A.2d 582, 596 (D.C.1991). Even assuming that Ms. Washington's state of mind was at issue, there was no basis, other than pure speculation, upon which the officer could offer an opinion in that regard, as the trial court concluded. Therefore, the court's ruling precluding such evidence was proper. *See Monacelli v. Monacelli,* 296 A.2d 445, 448 (D.C.1972).

### III.

### *Ruling Denying Certain Medical Records of the Victim*

Appellant also argues that the trial court abused its discretion in denying his request to compel the government or the minor complainant's health care providers to produce certain medical and psychiatric records related to her care and treatment. Specifically, appellant contends that he was entitled to additional records before and after the incident which might reveal that the complainant had been the victim of sexual abuse or had contracted a venereal disease previously. Appellant also sought any statements the child made in connection with the mental health counseling she received after the offenses in order to cope with the trauma of the sexual abuse.

### A. *Factual Background*

The rulings related to these issues arose in the following context. During the informal discovery process, the government provided appellant with records concerning Dr. Lee's examination of, and test results for, the minor complainant in September 1988, including office visits on September 21 and December 29, 1988. In response to appellant's motion for disclosure of additional medical records pursuant to Super.Ct.Crim.R. 16(a)(1)(D), the government agreed to provide M.D.'s records from Children's Hospital.[5] Subsequently, appellant filed an *ex parte* motion for a *subpoena duces tecum* for

included specific evidence of threats by the alleged perpetrator and a report of appellant's fears to government authorities. We note, however, the need for particular attention by the trial court to situations where the defense wishes to cross-examine government witnesses with respect to the possibility of the commission of the crime by a third party. The requirement of an adequate proffer may be difficult to fulfill in the absence of defense knowledge as to how the proposed question will be answered.

4. In any event, appellant was allowed to present his theory that someone else committed the crimes. In this connection, the court informed appellant's counsel prior to closing argument:

You can certainly argue someone other than Mr. Nelson did it and Mr. Nelson didn't have gonorrhea and whoever did this had to have

gonorrhea. I don't think that there is a basis to argue to the jury a specific name in terms of who that other person may have been.

\* \* \* \* \* \*

Well, you can argue anything that's in evidence in your closing argument but you cannot suggest to the jury that it's a specific person.

5. These records covered visits on September 26 and 29, 1988, October 11 and 13, 1988, November 30, 1988, December 21, 1988, and April 12, 1989, including mental health treatment "without substantive information regarding such treatment." As to these records, the child's mother had consented to the release of the information, according to the government. The government represented that it did not have any substantive mental health records in its possession and that it did not intend to use any such records at trial.

all of M.D.'s medical records in the possession of Children's Hospital and Dr. Lee.

The court then appointed counsel for the child who examined the records from Children's Hospital. M.D.'s counsel recommended the release of medical records in Dr. Lee's possession which were related to the discovery of the gonorrhea,[6] including those for her examination at Children's Hospital on September 26 and October 11, 1988. M.D.'s counsel, on her behalf, also did not oppose the release of the records for one year preceding M.D.'s diagnosis if an in-camera inspection tended to show evidence of sexual abuse at a time other than August 25, 1988. However, her attorney specifically opposed release of any records of post-event psychological counseling or medical records before September 1987 or after October 11, 1988. Essentially adopting M.D.'s attorney's recommendations, the trial court (Judge Kennedy) ordered disclosure of the medical records for a one year period, and appellant received them for the period between September 27, 1987 through September 26, 1988.

At the time of trial, appellant again sought to obtain any psychiatric records for M.D., this time as *Jencks* material.[7] It was appellant's position that such records might explain the reasons that the child initially denied being sexually abused and the circumstances surrounding her identification of appellant as the perpetrator of the crimes. The government contended that the requested material was not in its possession and that it had chosen not to examine or obtain the child's psychiatric records. Therefore, the trial court (Judge Eilperin) ruled that the material was not producible under *Jencks*, although the court observed that the defense might be able to obtain them by subpoena.

## B. Legal Analysis Related to Non–Disclosure of Certain Medical Records

■ The additional medical or mental health records which appellant sought were not producible by the government under Super.Ct.Crim.R. 16 or under *Jencks*. Rule 16 requires the government to permit inspection of results or reports of physical or mental examination "which are within the possession, custody or control of the government ... and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial." Super.Ct.Crim.R. 16(a)(1)(D). The requirement that the government have possession of the reports and records is also prerequisite to the obligation for production under the Jencks Act. *Frye v. United States,* 600 A.2d 808, 810 (D.C.1991); 18 U.S.C. § 1500.[8] The trial court concluded that the remaining records which appellant requested were not Jencks material because they were not in the possession of the government.

There is no dispute that the government sought no access to the remaining records which appellant wanted to obtain. "The Jencks Act is not 'so elastic as to embrace [such] materials' to which the prosecutor has never sought access." *See Frye, supra,* 600 A.2d at 812. The records involved here were not within the control of the government, but under the control of a private hospital and mental health providers. Thus, appellant's reliance on *Butler v. United States,* 481 A.2d 431 (D.C.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985) is misplaced. The grand jury transcripts which were the subject of the Jencks request in

---

6. The government had already provided these records.

7. *See Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). *See also* Super.Ct.Crim.R. 26.2, which implements the Jencks Act, 18 U.S.C. § 3500 (1970) in the District of Columbia, and contains essentially the same provisions. *See Hilliard v. United States,* 638 A.2d 698, 702 (D.C.1994) ("Under the Jencks Act a defendant is entitled to obtain, after the direct testimony of a government witness, prior statements ... relat[ed] to the subject matter of

the witness' testimony for possible impeachment of the witness.").

8. The Jencks Act provides in pertinent part as follows:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject as to which the witness has testified.

*Butler* were in possession of the federal prosecutors. The records involved here were not in possession of the prosecutorial arm of the federal government, nor in the possession of the government at all. Thus, appellant cannot rely on Jencks or Rule 16 to require the government to obtain and produce them. *See Frye,* 600 A.2d at 811–12. The government is not obligated to obtain records from private sources, which it does not intend to use for trial, to meet the requirements of Jencks or Super.Ct.Crim.R. 16. *See id.; see also United States v. Chavez–Vernaza,* 844 F.2d 1368, 1375 (9th Cir.1987), *cert. denied,* — U.S. ——, 114 S.Ct. 1324, 127 L.Ed.2d 672 (1994). Therefore, we reject this aspect of appellant's argument.[9]

■ Since M.D.'s parent had signed a waiver for release of the records to the government, appellant argues that such a waiver of D.C.Code § 14–307 (1989) constitutes an implied waiver as to other interested persons. Appellant's argument that the execution of a release for disclosure of medical records amounts to an implied waiver of the physician-patient privilege to other interested persons is raised for the first time on appeal. Generally, the court will not consider an issue not raised first in the trial court. *See Hunter v. United States,* 606 A.2d 139, 144 (D.C.) (quoting *Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)), *cert. denied,* — U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992); *see also Mitchell v. United States,* 569 A.2d 177, 180 (D.C.) (appellant is bound by position that his counsel took at trial), *cert. denied,* 498 U.S. 986, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990). We will reverse only for plain error under such circumstances. *See Baxter v. United*

*States,* 640 A.2d 714, 717 (D.C.1994). Under the plain error standard, this court will reverse only under exceptional circumstances where "a miscarriage of justice would otherwise result." *Id.; see also Harris v. United States,* 602 A.2d 154, 159–60 (D.C.1992) (en banc). Applying this standard we find no basis for reversal.

■ Appellant's position is that once the child victim's parent executed a consent to release her medical records to the government, she effectively waived the physician-patient privilege codified in D.C.Code § 14–307. This statute prevents a physician from disclosing confidential information about his or her patient's condition acquired during that professional relationship without the consent of the patient.[10] *Id.; Street v. Hedgepath,* 607 A.2d 1238, 1246 (D.C.1992).

■ Appellant is correct that a patient may waive or be deemed to have waived the physician-patient privilege under certain circumstances. We have recognized that a patient waives the privilege as to relevant evidence by filing a lawsuit which places in issue the patient's medical condition. *Hedgepath, supra,* 607 A.2d at 1246; *see also Sklagen v. Greater Southeast Community Hosp.,* 625 F.Supp. 991, 992 (D.D.C.1984). A patient-litigant may not authorize disclosure of only those portions of the medical records favorable to that party's position, while withholding other relevant portions which are unfavorable. *Sklagen,* 625 F.Supp. at 992. An authorization for release of medical information contained in a contract of insurance has been equated with the waiver of the physician-patient privilege where pertinent to a suit for recovery under the policy. *Jones v.*

---

**9.** We also reject, as a preliminary matter, appellant's argument that the ability to obtain materials from private sources constitutes constructive possession of them.

**10.** D.C.Code § 14–307 reads in pertinent part as follows:

(a) In the Federal courts in the District of Columbia and District of Columbia courts a physician or surgeon or mental health professional as defined by the District of Columbia Mental Health Information Act of 1978 (D.C.Code, sec. 6–2001 et seq.) may not be permitted, without the consent of the person affected, or of his legal representative, to dis-

close any information, confidential in its nature that he has acquired in attending a client in a professional capacity and that was necessary to enable him to act in that capacity, whether the information was obtained from the client or from his family or from the person or persons in charge of him.

(b) This section does not apply to:

(1) evidence in criminal cases where the accused is charged with causing the death of, or inflicting injuries upon, a human being, and the disclosure is required in the interests of public justice....

*Prudential Ins. Co.,* 388 A.2d 476, 483 (D.C. 1978).

■ However, appellant seeks to extend the rule beyond the limits of our prior holdings. Appellant urges the recognition of a general waiver by implication of any medical information, including mental health followup counseling for the victim of a crime, on plain error review. This cannot be done on the basis of this record. Whether an implied waiver has occurred depends upon the facts and circumstances of the particular case. *Cates v. Wilson,* 321 N.C. 1, 361 S.E.2d 734 (1987); *see also Richbow v. District of Columbia,* 600 A.2d 1063, 1069–70 (D.C.1991). The facts and circumstances surrounding the claimed implied waiver here were not developed in the trial court. To the extent that some facts existed bearing upon the legal question, neither those facts nor the implied waiver arguments were called to the attention of the court. In any case, waiver determinations are to be carefully scrutinized. Moreover, an implied waiver of the type suggested here has not been addressed by this court previously.[11] The trial court's failure to raise and address, *sua sponte,* the issue of waiver by implication can not be plain error under the circumstances, and we decline to so hold. *See Baxter, supra,* 640 A.2d at 717.

Moreover, appellant failed to show that the disclosure of additional medical records was required in the interest of public justice. *See* D.C.Code § 14–307; *Brown v. United States,* 567 A.2d 426, 428 (D.C.1989), *cert. denied,* 494 U.S. 1037, 110 S.Ct. 1497, 108 L.Ed.2d 632 (1990). When a party seeks to subpoena records subject to the provisions of D.C.Code § 14–307, that party must make the additional showing set forth in the statute, that the "disclosure is required in the interests of public justice." *See id.* Of course the documents must have evidentiary relevance and not be for the purpose of conducting a "fishing expedition." *Id.* (quoting *Cooper v. Unit-*

ed *States,* 353 A.2d 696, 701 (D.C.1976)). In spite of the trial court's inquiry, appellant was unable to show that medical records related to the child's medical care well beyond the time of the offense at issue were required to meet the interests of the public justice standard or that they were relevant. Therefore, we find no error in the trial court's ruling denying release of further medical records for the minor victim.

## IV.

Finally, appellant argues for reversal on the ground that the government intentionally discriminated on the basis of gender in exercising its peremptory challenges during the jury selection process. Appellant raised the issue after the jury had been selected, but before they were sworn. Applying the rationale set forth in *Batson, supra* note 1, which held that the peremptory challenges may not be used to strike potential jurors solely on the basis of race, appellant contended that the manner in which the government exercised its strikes similarly offended the Constitution. At the time of appellant's challenge, the Supreme Court had not yet addressed whether the Constitution prohibited intentional discrimination on the basis of gender in jury selection. Apparently accepting the applicability of *Batson* principles to gender-based discrimination and assuming that appellant had made out a prima facie case, the trial court elicited from the prosecutor gender-neutral explanations for the strikes she made and determined that there was no constitutional violation.

Appellant argues that the trial court erred in this ruling. The government, without conceding that a prima facie case of gender-based discrimination was made out, contends that the record supports the trial court's decision that the government exercised its strikes for gender-neutral reasons.

11. Here, the minor's parent purportedly signed an authorization for the government to review the child's medical records. Subsequently, the trial court appointed counsel to represent the child's interest in making the determination of whether to consent to release the records. None of the parties had the opportunity to address the effect, if any, of the mother's prior authorization for release to the government of the child's medical records, or the child's refusal through her court appointed attorney to release them. Similarly, no one had the opportunity to address, in this criminal case, whether any implicit consent should cover records unrelated to the victim's treatment for the physical injury resulting from the crime.

Since the trial of this case, the Supreme Court has ruled that the Equal Protection Clause of the Constitution prohibits discrimination in jury selection based solely on gender. *J.E.B. v. Alabama ex Rel. T.B.,* — U.S. —, —, 114 S.Ct. 1419, 1429, 128 L.Ed.2d 89 (1994). Such discrimination, "whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *Id.* at —, 114 S.Ct. at 1427. Although parties, consistent with the Constitution, may remove individuals they believe for other reasons to be unacceptable, they may not use gender "as a proxy for bias." *Id.*

The Supreme Court has outlined a three-step process for evaluating claims that the prosecutor has used peremptory challenges in a manner that violates the Equal Protection Clause.

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a [race]-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citing *Batson, supra,* note 1, 476 U.S. at 96–98, 106 S.Ct. at 1722–24) (internal citations omitted); *see also Tursio v. United States,* 634 A.2d 1205, 1210 (D.C.1993).

■■■■■ Just as for a *Batson* challenge, a party making a gender-based claim of discrimination must make a prima facie showing of intentional discrimination before the party challenged will be required to offer reasons for the peremptory strikes. *Id.* at —— —, 114 S.Ct. at 1429–30. In *Batson,* the

Supreme Court set forth the standard for establishing a prima facie case as follows:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." ... Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Batson, supra,* note 1, 476 U.S. at 96, 106 S.Ct. at 1723 (*citations omitted*); *accord, Jefferson v. United States,* 631 A.2d 13, 17 (D.C.1993); *Brown v. United States,* 627 A.2d 499, 505 (D.C.1993). If the party advancing the claim makes a prima facie showing of purposeful discrimination, then the burden shifts to the opposing party to provide a neutral explanation for the strikes. *Batson,* 476 U.S. at 96, 100, 106 S.Ct. at 1722–23, 1725; *Little v. United States,* 613 A.2d 880, 884–85 (D.C.1992).

In support of his claim of the improper gender-based exercise of peremptory challenges, appellant pointed out that the prosecutor exercised all of her strikes against men, except for one male alternate, who was allowed to remain on the panel. The exact composition of the venire panel is not apparent from the record.[12] The parties seem to agree that 4 of the 12 jurors selected were men. We need not decide whether sufficient facts appear in the record to support the

12. The government represents that the available venire consisted of 42% men (18/43), and the final jury consisted of 33% men (4/12). Some assumptions might be made about the gender of each individual by his or her name as reflected on the list of potential jurors, but such assumptions may or may not be consistent with fact.

We have cautioned that such critical facts must be established on the record in the trial court when challenges of this type are made. *See Jefferson, supra,* 631 A.2d at 16. The failure to do so may be fatal to the claim. *See Nelson, supra,* 601 A.2d at 590.

claim of statistical disparity to support an inference of purposeful discrimination. *See Jefferson, supra,* 631 A.2d at 16. The case can readily be resolved on the same basis relied upon by the trial court.

■ The trial court found the government's gender-neutral explanations sufficient to defeat the challenge. The prosecutor was able to recount the reasons for her challenges, referring to her notations regarding the individuals. She represented six different employment-related reasons, including unemployment, for striking potential jurors.[13] She struck one person because of her concern for the individual's lack of candor based on events which occurred during voir dire. The prosecutor also recounted striking others for the following reasons: (1) having an attorney as a partner; (2) inability to determine the exact job from the jury list; (3) possible knowledge of someone involved in the trial; and (4) youth and a disinclination of one individual to serve. Satisfied with the prosecutor's explanations for the strikes, and considering that the prosecutor had not used a strike to eliminate a male alternate, the trial court found no impermissible, gender-based discriminatory purpose and denied the motion.

■ Appellant now contends that the reasons given by the prosecutor were pretextual because they were frequently inconsistent with each other and unsupported by the record. Appellant did not make this argument in the trial court. It is well established that issues not raised in the trial court are generally not considered on appeal. *Spencer v. District of Columbia,* 615 A.2d 586, 589 (D.C. 1992); *Miller, supra,* 127 U.S.App.D.C. at 369–370, 384 F.2d at 321–322. Moreover, other courts have held that once the party has set forth neutral reasons for exercising peremptory challenges in response to a claim of purposeful discrimination, the burden shifts back to movant to show that the proffered neutral reasons are pretextual. *State v. Tims,* 865 S.W.2d 881, 884 (Mo.App.E.D. 1993); *K.S. v. Carr,* 618 So.2d 707, 710 (Ala.

1993); *cf. American Univ. v. Commission on Human Rights,* 598 A.2d 416, 422 (D.C.1991) (in a Title VII case, "the complainant must then demonstrate that the reason offered is a pretext for discrimination") (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *RAP, Inc. v. District of Columbia Comm'n on Human Rights,* 485 A.2d 173, 176 (D.C.1984)). The movant bears the ultimate burden to persuade the trial court that peremptory challenges were exercised in a discriminatory fashion. *United States v. Hughes,* 970 F.2d 227, 230 (7th Cir.1992) (citing *Hernandez, supra,* 500 U.S. at 371–72, 111 S.Ct. at 1873 (O'Connor, J., concurring)). In the trial court, appellant only offered the conclusory observation that the prosecutor's reasons appeared to be "somewhat disingenuous" because the government gave employment-based reasons for its strikes. Even on appeal, appellant provides only conclusory assertions without supporting references. Such conclusory assertions are insufficient to support the claim that the neutral reasons offered by the prosecutor were a sham.

Different treatment of female jurors possessing the same characteristics as the males who were excluded, absent other material differences, might indicate that the prosecutor's explanations are pretextual. *See Tursio, supra,* 634 A.2d at 1212. However, unlike the situation in *Tursio,* that showing has not been made in this case. Here, there was no evidence that the prosecutor had treated similarly situated men and women differently or that the trial court looked at improper factors in making its ruling. Moreover, the prima facie case here is not so compelling as in *Tursio,* a factor which this court took into account in finding inadequate the trial court's inquiry into the prosecutor's explanations for rejection of the jurors in *Tursio. Id.* at 1211.

■ The prosecutor's explanations of the reasons for exercising the challenges need not meet the requirements for challenges for cause, but the explanations must

---

**13.** Peremptory challenges may be exercised for reasons of employment. *See United States v. Ferguson,* 935 F.2d 862, 865 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d

807 (1992); *United States v. Romero–Reyna,* 889 F.2d 559, 562 (5th Cir.1989), *cert. denied,* 494 U.S. 1084, 110 S.Ct. 1818, 108 L.Ed.2d 948 (1990).

be legitimate, clear and reasonably specific. *Id.* (quoting *Batson,* 476 U.S. at 97, 98 n. 20, 106 S.Ct. at 1723, 1724 n. 20). We find no reason to reject the trial court's determination that the prosecutor's explanations met this standard on the record before us. We accord the trial court's findings on the issue of discriminatory intent deference, since they turn in large measure on an evaluation of credibility. *Batson, supra* note 1, 476 U.S. at 98, 106 S.Ct. at 1723–24; *Hernandez, supra,* 500 U.S. at 364–65, 111 S.Ct. at 1869; *Tursio,* 634 A.2d at 1210. "We will only overturn a finding regarding discriminatory intent in the use of peremptory challenges if it is clearly erroneous." *Hughes, supra,* 970 F.2d at 230. In light of the government's proffer of neutral reasons and appellant's failure to provide any reasons why these reasons were pretextual, the trial court did not clearly err in finding that there was no discriminatory intent in the government's use of its peremptory challenges. *See Hernandez,* 500 U.S. at 368–69, 111 S.Ct. at 1871; *Hughes,* 970 F.2d at 230 (citing *Ferguson, supra* note 13, 935 F.2d at 864 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d 807 (1992)). Accordingly, we find no error in the trial court's determination of this issue.

For the foregoing reasons, the judgments of conviction appealed from hereby are

*Affirmed.*

SCHWELB, Associate Judge, concurring in part and concurring in the judgment:

I agree that Nelson's conviction should be affirmed, and join parts I to III of the majority opinion. My views differ sharply from the majority's with respect to the so-called *Batson* issue,[1] however, and I write separately to explicate them.

### I.

The trial in this case was about the alleged sex abuse by an adult male of a little girl. As Justice O'Connor recently observed in her concurring opinion in *J.E.B. v. Alabama ex rel T.B.,* —— U.S. ——, ——, 114 S.Ct. 1419,

1430, 128 L.Ed.2d 89 (1994), "[a] plethora of studies make [it] clear that in rape cases, for example, female jurors are somewhat more likely to vote to convict than male jurors." *Id.* at ——, 114 S.Ct. at 1432 (citations omitted). "[O]ne need not be a sexist to share the intuition that in certain cases a person's gender and resulting life experience will be relevant to his or her view of the case." *Id.* Accordingly, if the *Batson* line of cases did not exist, and if "peremptory" challenges could still be exercised as "peremptorily" as in days of yore, one might expect (other things being equal) that, for pragmatic reasons, the prosecutor would be motivated to strike men and to try to keep women on the jury, while the defense attorney would be inclined to do exactly the opposite.

Although *Batson* existed at the time of the trial in this case (and *J.E.B.* has now extended *Batson's* reach to peremptory challenges based on a juror's sex), the strikes in this case were exercised by both sides in what one might wish was the *pre-Batson* manner rather than contemporary practice, and it was done with a vengeance! The prosecutor used *all ten* of her ten peremptory challenges to strike men.[2] The defense attorney used *all ten* of his challenges to strike women. In other words, in a case in which the sex of a juror had perceived potential for influencing the outcome, twenty out of twenty strikes were exercised in a manner that eliminated members of the disfavored sex from the jury. Ingrained habits sometimes die hard!

"In the problem of racial discrimination, statistics often tell much, and Courts listen." *Tursio v. United States,* 634 A.2d 1205, 1213 (D.C.1993) (quoting *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 632 (D.C.1989)). "Nothing is as emphatic as zero." *Tursio,* 634 A.2d at 1210 (quoting *United States v. Hinds County School Bd.,* 417 F.2d 852, 858 (5th Cir.1969) (per curiam), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970)). Although the alleged discrimination in this case was based on sex rather than on race, the force of the numbers is just as strong. Moreover, just as

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. She did, however, leave a male alternate on the jury.

there is "no acceptable place in the law for partial racial discrimination," *Tursio,* 634 A.2d at 1213 n. 7 (quoting *Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344, 350 (7th Cir.1970)), so, too a peremptory challenge may not be based in part on the juror's sex and in part on some other permissible ground.[3]  To believe that the sex of the jurors played no role whatever in jury selection in this case is to credit the unbelievable; defense counsel commendably does not even pretend that it was all happenstance.[4]

But, says the majority, "the trial court elicited from the prosecutor gender-neutral explanations for the strikes she made, and determined there was no constitutional violation." I agree with my colleagues that the trial judge's findings are entitled to considerable deference. *See* D.C.Code § 17–305 (1989). This does not mean, though, that we must cast aside the lessons of everyday life and the laws of probability. If the prosecutor told the court that she had flipped a coin ten times and that it had come up heads on each occasion, and if the defense attorney then reported that he had flipped the same coin ten more times and, without exception, it had come up tails, the trier of fact should, I think, be a little dubious about these assertions. If we add to this equation pragmatic reasons for the prosecutor to prefer heads (and for defense counsel to want tails), our suspicions would surely be even more pronounced. The statistical odds against such a result are overwhelming.[5] Yet the finding which the majority sustains here is (as to the jury proper, not counting one unchallenged male alternate) a pretty precise analogue to my hypothetical.

"Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Tursio,* 634 A.2d at 1213 (quoting *Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C. 1992)). To credit the assertion that the peremptory challenges in this case (by either side) were completely gender-neutral, one would have to accept a coincidence of staggering proportions.

The trial judge correctly found that the defense had made out a *prima facie* case of sexually discriminatory strikes by the prosecutor; ten men challenged in ten strikes, when men were in the minority on the venire, was surely more than enough. *Accord, Tursio,* 634 A.2d at 1210–11 (striking nine non-blacks and one black, to create an all-black jury, held to make out a very strong *prima facie* case).[6] Indeed, if the issue had been presented to him, the judge could have made a similar determination with respect to the defense. In holding that the prosecutor had rebutted the *prima facie* case, however, the judge evidently failed to include sufficiently in his calculus what I would call the "heck-of-a-coincidence" factor. One might, I suppose, remand the case with directions to the trial judge to articulate clearly whether he had taken statistical probabilities into account and, if so, how the prosecutor's explanation of her strikes had overcome so compelling a statistical showing. In my view, however, such a remand would be pointless, for the prosecutor's explanations, which were vigorously attacked by the defense as inconsistent and pretextual, fell far short of rebutting the tale told by the statistics. The statistics, in turn, were buttressed by the underlying substantive character of the con-

---

3. This case was tried before *Tursio* was decided, and the trial judge may not have applied the rigorous "no partial discrimination" standard articulated in that decision.

4. At oral argument in this court, Nelson's attorney, who also represented his client at trial, effectively acknowledged that his peremptory challenges of female jurors were based at least in part on their sex.

5. The probability of an unbiased coin tossed once coming up heads is one in two. The chances of its being tossed twice and coming up heads twice are one over two squared ($\frac{1}{2}^2$), *i.e.,* one in four.

The prospects of its coming up heads ten times are one over two to the tenth power ($\frac{1}{2}^{10}$), *i.e.,* one in 1024! *See, e.g.,* RICHARD A. WEHMHOEFER, STATISTICS IN LITIGATION § 3.04, at 40–41 (1985 & Supp.1993).

6. *See also United States v. Alvarado,* 923 F.2d 253 (2d Cir.1991) racial minorities constituted approximately 29% of venire, but half of the prosecution's strikes of jurors, and four-sevenths of its strikes of jurors and alternates combined, were of minority jurors; the court held that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson.*" *Id.* at 256.

troversy (a sex abuse case with a male defendant and a minor female complaining witness). I would hold as a matter of law, as we held on similar facts in *Tursio,* that the record established discrimination by the prosecutor on the basis of sex in the exercise of the government's peremptory challenges.

## II.

According to the government, the venire from which the jury was chosen included 18 men and 25 women; it was therefore 42% male. The jury which convicted Nelson consisted of four men and eight women; it was 33% male. As my colleagues point out, maj. op. at 18 note 12, these figures may be imprecise, for some first names are given both to boys and to girls, and the sex of every juror therefore cannot be definitively determined from the juror list. The defense has not challenged the prosecution's figures, however, and has certainly not presented us with a record that would establish a greater disparity between the sexual composition of the venire and of the jury.

I do not believe that the *Batson* doctrine was intended to require reversal of a conviction under circumstances like those here. In *Batson,* the prosecutor was able to use his peremptory challenges to strike all of the black potential jurors, so that the defendant, who was black, was tried by an all-white jury. In *Tursio,* the situation was reversed, but the prosecutor (in a case with overtones of racial hostility) removed all non-blacks from the jury.

In the present case, on the other hand, the strikes of the two sides effectively cancelled each other out, and the sexual composition of the jury was at least roughly comparable to that of the venire. At the very least, notwithstanding any imprecision in the available figures, counsel for Nelson did not prove that the jury was more overwhelmingly female than the venire. Both bodies contained reasonable proportions of men and women. Although it appears likely that a significant number of potential jurors of both sexes were struck because of their sex, Nelson has not shown that the exercise of peremptory challenges as a whole, by both sides, significantly affected the sexual composition of the jury to his disadvantage.

We stated in *Tursio* that "exclusion of even one black [or white] member of the venire for racial reasons violates at least that prospective juror's rights under the equal protection clause." 634 A.2d at 1211 (internal quotation marks omitted) (quoting *Little v. United States,* 613 A.2d 880, 885 (D.C. 1992)). The Supreme Court has recently made essentially the same point. *J.E.B.,* —— U.S. at —— n. 13, 114 S.Ct. at 1428 n. 13. These statements do not mean, however, that reversal is required in every case in which there has been a *Batson* violation. If, for example, the prosecutor struck one potential juror for a discriminatory reason, and the defense attorney struck six others on equally improper grounds, all seven of these struck jurors would have been wronged, but it would be absurd to reverse the defendant's conviction when the prosecution was far more sinned against than sinning.

On a record like this one, in which there was strong statistical evidence of discriminatory challenges by both sides, a defendant seeking reversal must demonstrate, in my view, that as a result of the peremptory challenges exercised by the parties, the sexual composition of the jury differed significantly, to his detriment, from the composition of the venire. *Cf. United States v. Sangineto–Miranda,* 859 F.2d 1501, 1521–22 (6th Cir. 1988).[7] No such showing has been made, and I therefore join my colleagues in voting to affirm Nelson's conviction.

---

7. In *Sangineto–Miranda,* the court said:

If, after the jury selection process has ended, the final jury sworn has a percentage of minority members that is significantly less than the percentage in the group originally drawn for the jury (or in the whole jury pool or in the district), then that would be a factor pointing toward an inference of discrimination. If, on the other hand, the percentage of minority members in the ultimate jury is the same or greater, that would be a factor tending to negate the inference of discrimination.

*Id.,* 859 F.2d at 1521–22. I note that in *J.E.B.,* each side used all but one of its peremptory challenges to strike potential jurors of the adversary's sex. The resulting jury, however, was all-female, and the judgment was reversed.